UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| MARK ANTHONY BUSHONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:26-CV-443-TAV-JEM |
| | ) | |
| MONROE COUNTY, TENNESSEE, JAKE KEENER, OFFICER WEBB, SANDRA SMITH, and JOHN/JANE DOES 1-20, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, a former prisoner proceeding pro se and *in forma pauperis* in this civil rights action under 42 U.S.C. § 1983 [*see* Doc. 8], has filed an amended complaint [Doc. 9] that is before the Court for screening in compliance with the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. § 1915(e)(2), to determine whether it states a justiciable claim. For the reasons set forth below, the Court will permit certain claims to **PROCEED** against Defendant Chief Jake Keener in his individual capacity and **DISMISS** all official-capacity claims and all claims against Defendants Monroe County, Officer Webb, and Records Clerk Sandra Smith.

## I. SCREENING OF COMPLAINT

### A. Standard

Because Plaintiff is proceeding *in forma pauperis*, this Court must screen the complaint and *sua sponte* dismiss any claims that are frivolous or malicious, fail to state a claim for relief, or are against a defendant who is immune. *See, e.g.,* 28 U.S.C.

§§ 1915(e)(2)(B); *Hill v. Lappin*, 630 F.3d 468, 470 (6th Cir. 2010) ("Because Hill's lawsuit seeks redress from governmental officers, and because Hill proceeded *in forma pauperis*, the district court screened Hill's complaint as required by 28 U.S.C. §§ 1915A and 1915(e)(2)(B).").

The dismissal standard articulated by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007) "governs dismissals for failure to state a claim under [28 U.S.C. §§ 1915(e)(2)(B)] because the relevant statutory language tracks the language in Rule 12(b)(6)" of the Federal Rules of Civil Procedure. *Hill*, 630 F.3d at 470–71. Thus, to survive an initial review, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Formulaic and conclusory recitations of the elements of a claim do not state a plausible claim for relief. *Id.* at 681. Likewise, an allegation that does not raise a plaintiff's right to relief "above a speculative level" fails to state a plausible claim. *Twombly*, 550 U.S. at 570. However, courts liberally construe pro se pleadings and hold them to a less stringent standard than lawyer-drafted pleadings. *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

A claim under 42 U.S.C. § 1983 requires a plaintiff to establish that a person acting under color of state law deprived him a federal right. 42 U.S.C. § 1983.

**B. Plaintiff's Relevant Allegations**

Plaintiff, a 63-year-old veteran, was booked into custody on "an administrative technical probation warrant" in Florida on November 1, 2025 [Doc. 9 ¶¶ 3, 9]. On

November 9, 2025, Plaintiff was transferred to the Monroe County Jail ("Jail") to await his probation-revocation hearing [*Id.* ¶ 9]. A revocation order was signed on December 16, 2025 [*Id.*].

Plaintiff treated his chronic health issues with "a natural, physician-authorized treatment plan" prior to his incarceration [*Id.* ¶ 10]. But once Plaintiff was transferred to the Jail, he was removed from that treatment [*Id.* ¶ 11]. Instead, his "serious, agonizing spinal and rib injuries" were treated only with "generic anti-inflammatory medication that was entirely ineffective at managing his severe pain" and "le[ft] his structural injuries completely unaccommodated" [*Id.*].

"Plaintiff was not provided food he could physically digest despite notifying the facility of his need" [*Id.* ¶ 12]. So, on November 12, 2025, Plaintiff texted his family the following: "[S]till have not eaten since [I have] been here[.] [N]o one tells you anything[.] I feel like they just don[']t care" [*Id.*]. Plaintiff's family contacted the Jail at 9:56 p.m., which "force[d] a guard to walk to the cafeteria to secure food Plaintiff could physically digest" [*Id.*].

Throughout November 2025, Plaintiff submitted kiosk requests for assistance with his severe PTSD and night sweats, but those requests were ignored [*Id.* ¶ 13]. At 1:30 p.m. on December 4, Plaintiff received "an automated system threat" warning him that "jail staff intended to revoke his wife's visitation and communication lifelines" [*Id.*]. At 5:12 p.m. on December 4, 2025, Plaintiff used the kiosk system to contact his family with the following message: "[P]lease contact the news[]paper and news station and make our voice

heard. . . . [I]'m thinking going to the media is the answer and if not th[e]n [I] will suffer through till we are together again and then we will get a lawyer" [*Id.*].

In mid-November 2025, while Plaintiff was housed in Cell Block C, Cell 12, Chief Keener ordered Plaintiff to exit his cell and step into the hallway [*Id.* ¶ 14]. When Plaintiff did so, Chief Keener "aggressively confronted Plaintiff, issuing severe verbal threats and explicitly stating that he was 'going to shut [Plaintiff's] wife's fucking mouth once and for all' and that he was 'tired of her calling'" [*Id.*]. Chief Keener also threatened to place Plaintiff in a "turtle suit" and ordered Plaintiff removed from general population housing [*Id.*]. This was all done in retaliation for the inquires and complaints Plaintiff's family had made concerning "his visible medical neglect and rapid deterioration" [*Id.*].

Chief Keener ordered Plaintiff "into absolute isolation" that included "continuous, blinding 24-hour overhead light illumination for seven continuous days" [*Id.* ¶ 15]. "This intentional deprivation of darkness was inflicted with full administrative knowledge of Plaintiff's protected veteran status, deliberately aggravating his clinically documented psychiatric trauma, PTSD, and severe sleep disorders" [*Id.*]. During this time, facility staff incorrectly told Plaintiff's wife that he was inside the facility's medical infirmary [*Id.* ¶ 16].

During this seven-day period, Plaintiff was also denied the one hour out-of-cell recreation time mandated under Tennessee Minimum Standards for Local Correctional Facilities despite Plaintiff's requests for recreation and exercise [*Id.* ¶ 17]. For three days, Plaintiff was on complete lockdown and did not leave his cell [*Id.*]. On the remaining four days, he was permitted out for no more than 15 minutes to shower [*Id.*]. And sometimes,

staff delayed Plaintiff's release from the cell until 2:00 a.m., which further disrupted his sleep [*Id.*].

On or about the fifth day of Plaintiff's isolation, Correctional Officer ("CO") Perry told Plaintiff "he 'had seen enough' and offered to secretly transfer Plaintiff to an alternative cell to grant him a single 'night of darkness' from the blinding lights" [*Id.* ¶ 18]. But Plaintiff was afraid of what would happen to CO Perry's employment if Chief Keener found out this had occurred, so he declined CO Perry's offer [*Id.*]. CO Perry "agreed with Plaintiff's assessment of Chief Keener's retaliatory nature" [*Id.*].

The Jail's medical personnel recognized "[t]he psychological and physical toll" the 24-hour lighting was taking on Plaintiff's health [*Id.* ¶ 19]. After a nurse evaluated Plaintiff and documented his "significant weight loss to 146 pounds," she requested that the administration deactivate the continuous lighting [*Id.*]. Jail staff falsely told the nurse that it was not possible to deactivate the lighting due to the absence of a functioning light switch [*Id.*]. But an inmate who occupied the same cell after Plaintiff "verified that the cell's lighting system functioned normally[,]" and that guards deactivated the lights each evening at 10 p.m. [*Id.*].

At one point, Plaintiff used the cell's emergency intercom system to state "I am being tortured" after the control tower questioned Plaintiff's request for a sergeant to report to his cell [*Id.* ¶ 20]. In response, a sergeant arrived at Plaintiff's cell and asked what Plaintiff's "'fucking problem' was" [*Id.*]. Plaintiff explained that the problem was the continuous overhead lighting, to which the sergeant untruthfully stated it was impossible to deactivate the illumination because the unit lacked a functioning light control switch

[*Id.*]. When Plaintiff "countered the supervisor's falsehood, describing his own observations of the cell setup," the sergeant "became highly hostile" and stood in the open cell door in a "physically intimidating stance, causing Plaintiff to fear physical retaliation" [*Id.*]. The sergeant repeated that he would not deactivate the lights and slammed Plaintiff's cell door shut [*Id.*].

After seven days, Plaintiff was transferred back into general population [*Id.* ¶ 21]. Plaintiff requested a medical weight measurement and was assessed a $10 medical fee [*Id.*]. When he was called out of his cell for the weight verification, the scale registered Plaintiff's weight at 149 pounds [*Id.* ¶ 22]. The nurse suspected inaccuracy, so Plaintiff was ordered to step off and then step back on the scale, at which time the scale twice registered Plaintiff's weight at 147 pounds [*Id.*]. Despite this, the nurse documented Plaintiff's weight at 149 pounds [*Id.*]. "Plaintiff immediately and vehemently vocally objected to the variance, demanding to see his records on the spot" [*Id.*]. Thereafter, Plaintiff filed a grievance demanding to see his medical charts and objecting to the nurse's data entry [*Id.*]. Plaintiff subsequently discovered a medical chart entry dated November 28, 2025, recording his weight as 146.7 pounds [*Id.*]

Either later that same day or the next day, a sergeant "actively intervened to enforce administrative compliance and silence the Plaintiff" by removing Plaintiff from his cell, escorting him to the front desk, and ordering Plaintiff on the scale in front of the same nurse who previously evaluated Plaintiff [*Id.* ¶ 23]. The same pattern occurred: Plaintiff's weight was 149 pounds on the first reading and 147 pounds on the second and third readings [*Id.*]. "When the nurse attempted to hold up a piece of paper to validate the higher metric of 149

pounds, Plaintiff openly called the measurement a lie . . . . [and] explicitly informed the staff that they could write down whatever numbers they wanted, but that the exact second Plaintiff was released from custody, he would formally turn the nurse in and report them directly to the State Medical Board" [*Id.*].

On December 7, 2025, Plaintiff filed a grievance requesting medical treatment for his PTSD, treatment for a bruise on his inner bottom lip, and a trip to the emergency room for an x-ray on his lower back, as his pain was worsening despite the fact that he had been taking three Advil tablets twice a day [*Id.* ¶ 24]. But Plaintiff "did not receive timely or adequate medical evaluation and treatment for the reported conditions" [*Id.*].

In December 2025, a guard transported Plaintiff to the medical unit, where a medical practitioner treated Plaintiff's back complaints [*Id.* ¶ 25]. While Plaintiff was sitting in a common area waiting to be escorted back to his cell, he explicitly asked the medical professional to evaluate his lip lesion [*Id.*]. In front of the guard and two other inmates, the medical practitioner stated, "You've got cancer" [*Id.*]. Thereafter, Jail administration deliberately delayed Plaintiff diagnostic access for an additional five or six weeks before transporting Plaintiff to an outside oncology clinic [*Id.* ¶ 26]. Upon evaluating Plaintiff, the oncologist determined Plaintiff required a follow-up appointment in two months "to monitor the growth" [*Id.*]. The oncology staff explicitly asked the transport officer, CO Webb, how to process the paperwork, and CO Webb took physical possession of the clinic's paperwork and transported Plaintiff back to the Jail [*Id.*]. But Jail personnel failed to arrange the required follow-up, leaving Plaintiff's lip lesion "without the recommended specialist monitoring" [*Id.*].

On February 24, 2026, Plaintiff "logged" that he had injured his back on Sunday and had "been down ever since" [*Id.* ¶ 24]. Plaintiff's family sent him stretching diagrams because Jail medical staff refused to treat Plaintiff [*Id.*]. Meanwhile, Plaintiff's back condition worsened, and his conditions may require surgical intervention [*Id.*]. Even so, Jail administration continued to "require Plaintiff to perform manual trustee labor" following Plaintiff's classification to trustee status from January 21, 2026, through the remainder of his confinement [*Id.*]. "Concurrently, when Plaintiff's sister-in-law contacted the facility voicing parallel emergencies, staff completely contradicted their prior narrative. Plaintiff alleges that facility personnel informed his sister-in-law that he was being held on suicide watch, although Plaintiff disputes that characterization of his confinement" [*Id.* ¶ 25].

After Plaintiff was sentenced in December 2025, Records Clerk Smith told Plaintiff he could not receive good-behavior credits unless he obtained trustee status [*Id.* ¶ 27]. Once Plaintiff received trustee status, Jail personnel told Plaintiff he was "required to serve 100 percent of his sentence with zero statutory time offsets" [*Id.*]. Plaintiff submitted multiple kiosk entries "challenging this structure" that went unanswered [*Id.*]. But after Jail staff "intercepted a phone recording wherein Plaintiff threatened to obtain legal counsel to expose calculation errors, an electronic entry was issued logging a credit calculation consisting of exactly 19 trustee days and 4 good behavior days, totaling 23 days of credit for January" [*Id.*]. Additionally, Jail officials refused to credit Plaintiff's November 9 "transit arrival day from Florida," which would have provided him an additional 2 days of

credit "under state rules" [*Id.* ¶ 28]. All these inconsistencies and irregularities resulted in Plaintiff being confined nine days past his lawful release date [*Id.*].

Following his release from custody on May 28, 2026 [*Id.* ¶ 28], "Plaintiff sought access to his jail administrative files and electronic logs under Tennessee's public records provisions" [*Id.* ¶ 29]. Plaintiff was denied inspection [*Id.*].

Immediately after his release in May 2026, Plaintiff was evaluated through the Department of Veterans Affairs ("VA") [*Id.* ¶ 30]. Plaintiff was diagnosed with an "angulated fracture of the left sixth rib and severe left foraminal spinal narrowing" [*Id.*]. Plaintiff was referred for further neurological evaluation [*Id.*]. The VA also started Plaintiff on various prescriptions to manage his physical and psychological symptoms [*Id.*]. "Plaintiffs pre-existing, historic VA medical records documenting his baseline injuries had previously been physically hand-delivered directly to Chief Keener by Plaintiffs spouse and children during an official facility visit while Plaintiff was confined. Despite this direct notice of his underlying spinal vulnerabilities, Chief Keener and jail management, operating pursuant to official municipal custom, maintained Plaintiff's forced manual labor assignments and failed to provide adequate medical intervention" [*Id.*].

Aggrieved by these events, Plaintiff filed the instant action for declaratory relief and monetary damages against Defendants Monroe County, Chief Keener, Officer Webb, Records Clerk Smith, and John/Jane Does 1–20 alleging (1) an Eighth and Fourteenth Amendment violation against all Defendants for deliberate indifference to his serious medical needs [*Id.* ¶ 31]; (2) an Eighth and Fourteenth Amendment violation against all Defendants for unconstitutional conditions of confinement [*Id.*]; (3) a First Amendment

violation against Chief Keener for retaliation [*Id.* ¶ 32]; and (4) a Fourteenth Amendment violation against Defendants Monroe County and Records Clerk Smith for "unlawful over-detention and deprivation of liberty without due process" [*Id.* ¶ 33]. The individual defendants are sued in both their individual and official capacities [*Id.* ¶ 5–8]. Plaintiff concedes that the Jail had a grievance procedure that he did not utilize prior to filing this action but maintains that he could not "trust the grievance process without retribution" because he "had already been punished for complaining" and Chief Keener was responsible for responding to grievances [*Id.* at 2].

### C. Analysis

The Court will address Plaintiff's claims against the individual defendants in their individual capacities before addressing the claims against Monroe County and the individual defendants in their official capacities.

#### 1. Individual Capacity Claims

To state a claim against an individual defendant in his or her individual capacity, the complaint must plausibly allege that a defendant was personally involved in a violation of Plaintiff's constitutional rights. *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (providing that "a complaint must allege that the defendants were personally involved in the alleged deprivation of federal rights" to state a claim upon which relief may be granted); *Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Three Defendants are mentioned by name in Plaintiff's amended complaint: Chief Keener, Officer Webb, and Records Clerk Smith [Doc. 9 ¶¶ 6, 14–16, 18, 26, 27, 30].

As to Chief Keener, plaintiff alleges that in November 2025, Chief Keener threatened Plaintiff and ordered Plaintiff to be placed in an isolated booking cell for seven days, despite Chief Keener's "knowledge of Plaintiff's protected veteran status" [Doc. 9 ¶¶ 14–16]. Plaintiff also claims that, at some point, Chief Keener was provided Plaintiff's VA records but that he nonetheless ignored those records, "failed to provide adequate medical intervention[,]" and "maintained Plaintiff's forced manual labor assignments" [*Id.* ¶ 30].

The fact that Chief Keener allegedly threatened Plaintiff is inactionable, as verbal threats and/or harassment do not constitute constitutional "punishment" or otherwise raise a constitutional issue. *See Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987). Therefore, this allegation fails to state a claim under § 1983.

Next, even assuming Plaintiff's medical care and labor claims are colorable against someone, Plaintiff has not alleged any facts from which the Court could plausibly infer that Chief Keener was personally responsible for withholding any medical care from Plaintiff or requiring Plaintiff to perform manual labor as a trustee.[1] And to the extent Plaintiff seeks to hold Chief Keener liable for the actions of subordinates over which he exercised supervisory authority, that is not a theory under which Chief Keener may be liable under § 1983. *Iqbal*, 556 U.S. at 676 (2009) ("[O]ur precedents establish . . . that Government officials may not be held liable for the unconstitutional conduct of their subordinates under

[1] As to Plaintiff's manual labor allegations, the Court also notes that Plaintiff does not allege that he was forced into trustee status over his objection or that he informed Chief Keener that he was unable to perform the trustee work but was nonetheless forced to continue in the role.

a theory of *respondeat superior.*"); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) ("[A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless [he] 'either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'").

However, the Court finds Plaintiff has stated colorable claims against Chief Keener for allegedly ordering Plaintiff to be placed in isolation under continuous, blinding lights for seven days in order to silence the complaints of Plaintiff's family. Accordingly, the Court will **PERMIT** a retaliation claim and a conditions-of-confinement claim to proceed against Chief Keener in his individual capacity based on these allegations. All other claims against Chief Keener individually will be **DISIMISSED**.

As to Officer Webb, plaintiff maintains that Officer Webb took physical possession of the oncology clinic's paperwork and transported Plaintiff back to the Jail, where Jail personnel failed to schedule the follow-up recommended by the specialist [Doc. 9 ¶ 26]. However, Plaintiff does not allege any facts from which the Court could infer that Officer Webb's own actions are the reason Plaintiff did not receive follow-up care. That is, Plaintiff does not allege any facts permitting the inference that Officer Webb purposefully or intentionally withheld this paperwork from medical personnel so as to deprive Plaintiff of a constitutional right. And mere negligence cannot form the basis of a § 1983 claim. *See, e.g.*, *Daniels v. Williams*, 474 U.S. 327, 331–32 (1986); *see also Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (finding the subjective component of a medical-care

claim requires prison officials have "a sufficiently culpable state of mind in denying medical care"). Accordingly, Plaintiff has failed to state a cognizable claim against Officer Webb, and all claims against him in his individual capacity will be **DISMISSED**.

As to Records Clerk Smith, plaintiff maintains that Smith is responsible for the irregularities and miscalculations that resulted in him remaining incarcerated nine days past his maximum statutory release date, despite having been provided the correct calculations by Plaintiff [Doc. 9 ¶¶ 27, 33; *see also* Doc. 9-2 p. 18].[2]

In his amended complaint, Plaintiff does not disclose his original charge of conviction or the basis for his revocation, the percentage of that sentence he was ordered to serve, or the basis for his belief that he was entitled to sentence credits [*See* Doc. 9]. And while the Court credits as true Plaintiff's statement that he was sentenced to 11 months and 29 days, and Plaintiff identifies months for which he believes he will receive sentence credits [*see* Doc. 9-2 p. 18], he does not allege any facts explaining the statutory basis for his calculations. Thus, there are no well-pled facts establishing that Plaintiff is entitled to those credits applied in the manner he presumes.[3] Plaintiff's claims against Records Clerk Smith in her will individual capacity will be **DISMISSED**.

---

[2] Plaintiff's attached exhibits are considered part of his complaint. *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) ("[D]ocuments attached to the pleadings become part of the pleadings[.]" (citing Fed. R. Civ. P. 10(c))).

[3] For example, Tennessee law permits certain qualifying prisoners a deduction equal to one-quarter of their sentence, but those credits may be revoked in part or in whole if the prisoner "violates the rules and regulations of the jail or workhouse, or otherwise behaves improperly[.]" Tenn. Code Ann. § 41-2-111(b). And prisoners who receive work credits under Tenn. Code Ann. § 41-2-147 are ineligible for good-time credits under § 41-2-111(b). *See* Tenn. Code Ann. § 41-2-147(c). It is not clear whether Plaintiff's calculations include the type of double counting prohibited by Tenn. Code Ann. § 41-2-147(c).

This leaves the John/Jane Doe Defendants. While it is permissible to file a civil action naming John/Jane Doe Defendants, the mere filing of a complaint does not commence a civil action against an unidentified party. *See Smith v. City of Chattanooga*, No. 1:08-CV-63, 2009 WL 3762961, at *5 (E.D. Tenn. Nov. 4, 2009) ("A civil action cannot be commenced against a fictitious party such as an unknown John Doe." (citing *Bufalino v. Mich. Bell Tel. Co.*, 404 F.2d 1023, 1028 (6th Cir. 1968))). Instead, "until an amendment adding additional defendants has been permitted by the court," allegations against an unknown defendant "are merely 'surplusage[.]'" *Dunn v. Paducah Int'l Raceway*, 599 F. Supp. 612, 613 n. 1 (W.D. Ky. 1984) (citation omitted). Therefore, even if Plaintiff's claims against the John/Jane Doe Defendants are colorable, his complaint cannot proceed against them until Plaintiff amends his complaint to identify the intended Defendant(s) by name and asserts a specific factual basis for each intended Defendant's conduct.

### 2. Entity and Official Capacity Claims

Plaintiff's claims against the individual Defendants in their respective official capacities are actually against the entity that employs them. Here, that is Monroe County, at least as to the Jail staff.[4] But Monroe County may be liable under § 1983 only where implementation of its customs or policies caused a violation of Plaintiff's constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (providing that a municipality may be liable only where "execution of [its] policy or custom, whether made

---

[4] Plaintiff also alleges wrongdoing by medical personnel at the Jail, but it is not clear whether these individuals are employed by Monroe County or a third-party contractor.

by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury").

Although Plaintiff asserts that Monroe County bears liability in this action, he has not alleged any facts that would permit the plausible inference that a custom or policy of Monroe County caused a violation of his rights to medical care or the adequate conditions of confinement, or that he was falsely imprisoned or retaliated against pursuant to any Monroe County policy or custom. As such, Plaintiff has failed to state a claim under § 1983 as to Monroe County or any of the Defendants in their respective official capacities, and these claims will be **DISMISSED**.

## III. CONCLUSION

For the reasons set forth above:

1. Plaintiff has stated colorable retaliation and conditions-of-confinement claims against Defendant Chief Jake Keener in his individual capacity, and these claims will **PROCEED**;

2. The Clerk is **DIRECTED** to send a Plaintiff service packet (a blank summons and USM 285 form) for Defendant Keener;

3. Plaintiff is **ORDERED** to complete the service packet and return it to the Clerk's Office within 21 days of entry of this Order;

4. At that time, the summons will be signed and sealed by the Clerk and forwarded to the U.S. Marshal for service, *see* Fed. R. Civ. P. 4;

5. Plaintiff is **NOTIFIED** that if he fails to timely return the completed service packets, this action will be dismissed;

6. Defendant shall answer or otherwise respond to the complaint within 21 days from the date of service. If Defendant fails to timely respond to the complaint, it may result in entry of judgment by default against him;

7. All official-capacity claims and all claims against Defendants Monroe County, Officer Webb, and Sandra Smith are **DISMISSED**; and

8. Plaintiff is **ORDERED** to immediately inform the Court and Defendant or his counsel of record of any address changes in writing. Pursuant to Local Rule 83.13, it is the duty of a pro se party to promptly notify the Clerk and the other parties to the proceedings of any change in his address, to monitor the progress of the case, and to prosecute or defend the action diligently. E.D. Tenn. L.R. 83.13. Failure to provide a correct address to this Court within 14 days of any change in address may result in the dismissal of this action.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE